Zach Greenemeier is here for the appellant Sylvester, Stacey Miller is here for the appellee Barnett and Mr. Greenemeier you may begin when you're ready. Good morning, your honors. Zach Greenemeier for plaintiff Keith Sylvester. Thank you for hearing from us today. May it please the court. Keith Sylvester had nothing to do with the deaths of his parents. As we speak, another man with no connection whatsoever to Sylvester is being prosecuted for the Hubbard's murder based on geolocation evidence and evidence that he pawned Deborah Hubbard's missing gold jewelry. I acknowledge that on first glance there were strange coincidences. Sylvester went to the house at 3 a.m. before it set fire at 4 a.m. But a reasonable officer would have known and a reasonable jury could find that Detective Barnett did know on December 28, 2018 when he obtained the warrant that Sylvester could not possibly have committed any murder. On plaintiff's facts at summary judgment this legal process and the resulting 14 month detention was unlawful. This is because Sylvester had an over-determined and unfalsifiable alibi. There has been no explanation for how Sylvester could have committed the murders Barnett alleged with consideration of the following two facts. One, plaintiff left the house at 8 p.m. and did not go back inside until after the flames were extinguished. And two, Harry Hubbard had a normal phone call with his granddaughter Nayara Walton at 9.30 p.m. in which all was well. Well, I think the time frames are a little closer than what you've represented. I believe the parties seem to have settled in the deposition that he left no later than 9 p.m. And then the phone call was at 9.15 or 9.20. The phone call was at 9.20, yes, Your Honor. It was at 9.20. So, I mean, they could have been off by 20 minutes. So, Barnett has said that Sylvester was exactly where he said he was when he said he was. I've got no doubt about that. Yeah, I couldn't tell from the record how exactly they could pinpoint his, you know, did they know where he was minute by minute? Or was it sort of in chunks of time like he was at the convenience store between this hour and that hour? Could you explain that to me? Yes, if he knows the location from the following, we know that he knows the location from the following sources. In addition to just his testimony about it, we have the Sylvester's phone records were obtained the first week. Do you warrant Sylvester Barnett had those and that had GPS location, if not on a minute by minute basis, but, you know, in real time. And then we also had surveillance video from the places that plaintiff said he was at when he said he was there, which also lined up with the cell phone records. We also had plaintiff's dash camera video, which showed each trip that he went on. Again, corroborated by the times. I guess my question is, is there anything that pinpoints more exactly when he left the home of his parents? Yes, we know that he, I believe that the phone records and these are in Exhibit A to our opposition to summary judgment. There's a PDF called ATT phone records, and these are on page 3,135 to 3,150. But they show that he leaves at approximately 8 p.m. And this is corroborated by what happens next and included in Barnett's report that Sylvester goes to him and his wife's apartment. And then he goes from there to a convenience store and he's filmed on camera at a convenience store at approximately 940, right? So given all this and given Barnett's… Barnett and the judge and the jury just has to have arguable probable cause for the arrest warrant. And he's got the fact that Sylvester drove around the house suspiciously without getting out of the car. He brought mothballs and alcohol, which could be used as an accelerant. He thought Sylvester was the beneficiary of the insurance policy. All he needs is an arguable probable cause, right? Do you have a materially similar case to support a constitutional violation? Right. So in this instance, we're looking at the probable cause standard. And probable cause precludes a divide-and-conquer approach. As the Supreme Court said, it's a practical, common-sense decision in Illinois v. Gates. And if an officer knows that a crime is impossible, if there's a perfect alibi, no matter what the other inculpatory facts look like— and I acknowledge there are some, although we have quibbles about inferences drawn— then there cannot be probable cause, there cannot be arguable probable cause, there cannot be anything. So I thought this was—and correct me if I'm wrong, but I thought you were pitching this as a malicious prosecution claim. So your argument was, look, he got the warrant, but he got the warrant under false pretenses that he made misrepresentations in the warrant application. Is that your argument? And I think there's— So two questions about that, then. What are the representations that were false or misleading in the warrant application? And then I guess the subsidiary question is, can a police officer get qualified immunity for making false statements in a warrant application? So starting with the law aspect, if an officer makes either knowing or reckless, materially false statements, or omits truthful exculpatory statements, then there's no qualified immunity so long as there's not actual probable cause. And so turning to what those are, and sometimes an omission and a falsehood are two sides of the same coin, right? But the first one and the most obvious one is that Barnett writes in his warrant that Sylvester is the only person with opportunity, ability to do this when he knew that it was not possible for this to have happened based on the Niara Walton call at 9-29-30. A couple other affirmative false facts. Barnett says that a plaintiff bought his wife a plane ticket the day before the murder. In fact, his wife bought her own plane ticket well before anyone knew that Harry Hubbard was coming down. Harry Hubbard came down with half a day's notice without any baggage whatsoever, not even a change of underwear. And Barnett knew that was false? Yes, he had. How did he know that was false? He had the receipt from the plane ticket and the credit card, Melissa Sylvester's credit card. The sole beneficiary information, Barnett says that he got this information from the arson investigators. The arson investigators say, we did not tell him that, we would not have told him that, that didn't happen. And, of course, it's not true. He was a beneficiary, as the district court pointed out, right? But the way the warrant is worded, it says he's the beneficiary, and then that's corroborated that this is Barnett's belief about it and what he was trying to infer by the probable cause hearing or the first appearance where he says that Keith Sylvester was going to get between $150,000 to $200,000 in his pocket, which is made up. Turning to omissions, you know, so even if... Before we turn to omissions, there was something about the mothballs, which Judge Wilson raised, in the warrant. And, frankly, I'm a little confused as to what the mothballs had to do with this, but he did mention the mothballs in the warrant. So could you just explain whether that was, whether he was correct about the mothballs, whether that was truthful in the warrant or whether that was a falsehood? So the day of, they go, they buy various household items, including mothballs. The, you know, what is, if not said outright, is heavily intimated in the warrant is that these mothballs were used to start the fire. Mothballs plus alcohol. Mothballs plus alcohol, right. Is an accelerant. So a couple things on this, right?  The mothballs, the two boxes that they bought, are conspicuously on the kitchen counter. It's like the least sooty thing. They're unopened. On the kitchen counter, they go back and forth in video. You can see the officer right there, right. For the point about the accelerant, So first, Mr. Sylvester's had the unopened bottle of alcohol at his apartment. But two things on the accelerant. One, the use of an accelerant is antithetical to Barnett's theory of a slow burn fire, right. Like an accelerant makes fire go fast. His theory is that this is a smoldering fire that's been going on for eight or more hours, right. With regard to, and so about the alcohol, what was not included in the warrant, and what is a material omission if you think the alcohol has anything to do with this, is that on the scene, Mr. Sylvester, who's wearing the same shorts and shoes that he's been wearing all day, corroborated from video from Walmart where he purchases it to a convenience store an hour beforehand, 30 minutes beforehand. He gets sniffed up and down by a canine. His car gets sniffed up and down by a canine. His ice cream truck gets sniffed up and down. And they didn't detect anything there. And that would have been, you know, that they're sniffing to smell just that. And the fact that there's not a trace on him is exculpatory and should have been included. But again, turning back to the two key facts, Barnett has conceded, has never argued, that Mr. Sylvester was in the house after at latest 9 p.m. There's a phone call that happens after 9 p.m., at 920, where everything is fine, right. And a reasonable officer would know that these people, A, hadn't been, you know, they don't have ligatures around their neck when everything is okay, according to the phone call. And two, that if this fire, you know, the arson investigator said the fire was started in two places, multiple points of origin, they would react to the fire that's been going on for, we say, an hour and a half based on the phone records, but at least half an hour. This is a 1,200 square foot house. You know, if there was burning toast, they would react to the burning toast. Certainly, if there's two fires going on, there would be some reaction. I'd like to save my time. All right. Thank you, Mr. Greenemeier, Ms. Miller, for Barnett. May it please the court? My name is Stacy Miller, and I represent the appellee, Detective James Barnett. This is a case that fits squarely within the definition of probable cause. In this circuit, probable cause is just that, a probability. It's not 100% accuracy. It is enough information to cause a reasonable officer to believe that a crime has been committed. And that's exactly what we have here. Well, I believe Mr. Sylvester's argument is that it was impossible for Sylvester to have committed this crime because he left the house no later than nine, yet the victim made a phone call at approximately 920. And Officer Barnett testified that he had no doubt that Sylvester was where he said he was during this entire period. So why is that not a material omission that would make it not probable at all that he had committed the crime? Yes, Your Honor. And to your previous point that you asked appellant's counsel, there are a lot of confusing statements about the timeline. There is Mr. Sylvester at the scene. He says he left at one time, and then later, about a week later, he has a different statement about what time he left. There is surveillance video of him at 940 p.m. But before that, we know that with the dash cam video that there is an indicia of unreliability. There are parts of that video that have been cut out, and we don't know where they are. And there was a special investigator who was able to tell Detective Barnett that this video had been altered. So we don't actually know exactly where Mr. Sylvester was at the time. Mr. Greenmeier said that the dash cam video showed when he left the home. Is that correct? I thought that's what he said. It did show at 3 a.m. when he came to the home and left the home. That is in the video, yes. But with respect to when he left the evening before, there's nothing that can pinpoint that? I know that. That the officer would have had before him at the time. Mr. Greenmeier mentioned geolocation in terms of the GPS on the phone, and that's how he could have located him. But the geolocation was something that was not used until the investigator, or excuse me, until ADA Sprinkle was in the investigation, and that was something that he used. The geolocation was not something that Detective Barnett had access to or even knew about at the time of this particular incident. What about this? So I'll tell you, my main concern in this case is not so much with the ultimate result, but it looked like the district court applied the wrong legal reasoning here. We've said in a number of cases that for a malicious prosecution claim, where the allegation is that the warrant misstated, the warrant application misstated the facts, that it doesn't matter kind of whether surrounding facts that were never told to the judge would have established probable cause. So the question for you is, did the judge, the district court here, use the wrong standard to evaluate this claim? I don't believe that the district court used the wrong standard. In the Franks case, the Supreme Court of the United States held that the warrant itself doesn't necessarily have to be truthful. And what they mean by that is that truthful in the sense that every fact in the warrant is necessarily correct. It has to be what the officer reasonably believes based upon the evidence. Oh, absolutely. But I think what the plaintiff is suggesting is that, and I just don't really see this in the district court's opinion, but maybe I'm misreading it, but I think what the plaintiff is suggesting is that there were things in the warrant application that the officer knew to be false at the time he put them in the application. So, for example, you know, one, it may not be super important, but one that seems pretty demonstrably false is this idea about when the plane ticket was purchased. I mean, was that a misrepresentation of the warrant? I don't believe that there was ever any testimony from Detective Barnett specifically about when the plane ticket was purchased. I'm sorry, why would the detective testify about that? If there were any questions in his depositions in order to ask about exculpatory information that was not included in the warrant. No, I'm sorry, the warrant application specifically says that the plane ticket was purchased at a time. Let's see if I can find it. Let's see. Yeah, the warrant application says that Suvelster had sent his wife Melissa home one day prior to the fire. That's what the warrant application says. Isn't that just false? No, Your Honor, I don't believe it's false. Her plane ticket was for one day before this incident happened. So, she was sent home that one day before. In terms of when it was purchased, the evidence demonstrated that it was not purchased one day before. Okay, okay. So, even in the absence of intentionally placing false information in the warrant application, if an officer is reckless with the facts, reckless with the facts, that's enough to initiate qualified immunity under our case law, isn't it? Yes, Your Honor, if there is a reckless omission. Right here, there's a lot of, I know he was a rookie officer. This was, he was new in the force, right? He was new to being a homicide detective. Okay. But he had sat on previous homicide investigations, and this was the first one where he was leading, not that he had ever assisted in, in this particular unit. And what about the fact that there was evidence of strangulation? The dad apparently had a conversation with his granddaughter during the time that a strangulation would have taken place, and there's no mention, there's no mention of it in the warrant application. And the medical examiner found that the death occurred by soup in the lungs, which indicated life before the fire. That's enough, that's more evidence of recklessness on the part of the officer. Well, Your Honor, I actually believe that it is more a negligent omission than recklessness, which under the Madawala case, a negligent omission is not a constitutional violation. I mean, if we look back specifically at Detective Barnett's deposition testimony concerning the phone call with Nayyirah, Detective Barnett had no independent recollection of the time of that specific phone call. When he was asked about the phone call in his deposition on page 166, he said that he only remember getting text messages from who he believed was a daughter, but it was actually the granddaughter, Miss Nayyirah. And he also, in his incident report, only spoke about the text messages that he received from her. He didn't talk about a timeline in terms of when that particular call happened. And then when he was asked specifically about whether he matched up the phone records to what Miss Nayyirah said, he said, I don't remember, you know, and this is on page 167 of his deposition, I don't remember, you know, those phone records or any phone activity for the day or so prior to their deaths factoring into the probable cause analysis. I had a different investigator looking at phone records, but I don't recall. I don't recall that, no. So it actually was not Detective Barnett that was looking at the phone records. So he had a separate investigator looking at the phone records. And had that been his line of questioning or his idea about this specific timeline, then he necessarily wouldn't have known that that timeline didn't match up with all the other information that he had received. So we know that before he applied for the warrant, he actually spoke with the granddaughter. Yes. Right? Officer Barnett did. Yes. So are you saying he spoke with her, but he didn't know the time? She didn't tell him the time? What's your argument there? Because he clearly spoke with her during the investigation. Yes. What I'm saying is that he spoke with her, and in his deposition, he didn't have any specific recollection of the time that she stated. When he was asked about any calls the day before, all he remembered from that call was that she sent text messages. That's what he stated in his deposition, and that's also what he put in the incident report at page 5. All he stated was that she had text messages. That was all that he recalled from that particular conversation. Well, at the time of the deposition, that's all he recalled. But we have to look at what he knew before he applied for the warrant, right? Yes, Your Honor. And that's where we look back to his incident report that was written, the portion of his incident report that was written around July 8th, where he stated that he spoke with Ms. Vera Walton, and that she sent him text messages. That is all that he stated in his incident report, page 5, which is document 101-2, about that particular call. And later, that was all he remembered in his deposition as well. Isn't there in the record an audio file that Sylvester transcribed of that phone call with Ms. Walker? Yes. And that indicates the time was 9-15, I believe, the time of the phone call. Am I correct about that? I have in my notes here, 9-20 was around the time that she spoke to him, but it could have been 9-15. So he had that conversation before he applied for the warrant, didn't he? Yes. Okay. You get a lot of these qualified immunity cases on appeal involving a malicious prosecution. Usually, there are cases where the charges are dropped after the arrest, 15 months in jail before the charges are dropped. He spent a year and a half in jail without an indictment? That seems a little unusual. Yes, Your Honor. While we can't necessarily speak to what exactly caused that 15 months, we do know that there was a further investigation. Detective Barnett didn't just close up his notebook and move on to the next case. He continued to review the information that he received. He also worked with ADA Sprinkle and the technology that they had in order to continue to look for any other suspects, any information that he already didn't have access to, and he included that information in his incident report as well. So there was a continuous investigation into what exactly happened. There was a lot of information that was known at the time of the warrant, and that information went from 22 pages of an incident report and was deduced down to two pages of a warrant, but that didn't necessarily stop the investigation. Ultimately, once the information about Mr. Muckle and the geofencing and all of that information was available, that was when, ultimately, Mr. Sylvester was released. Did the warrant application say anything about his alibi, about the video of him in stores and things like that? Yes, Your Honor, I believe so. I do believe that there were statements about him gambling throughout the night and also his dash cam video that he turned over to the police without them ever even asking for it. Let's see. Who is Ron Martin? Mr. Ron Martin was the first, I guess, suspect or alternate that Mr. Sylvester mentioned, and that was actually at the scene of the incident. And that's another thing that— Is that the person who's now been arrested? No, this is a neighbor down the street that Detective Barnett did interview, did ask questions, and he seemed to have a reliable story. He's actually also very emotional, which is something that Detective Barnett noticed, in contrast to the way that Mr. Sylvester presented at the scene. And not only Detective Barnett, but other officers at the scene did believe that it was very suspicious, the way that Mr. Sylvester came to the scene, the information that he was giving, that he was saying that it may have been some alternate suspect, Mr. Ron Martin. There was a lot of information given there that caused suspicion, and that is— Yeah, I think it's clear that they had— I mean, it was perfectly reasonable for them to look at Sylvester for this murder, no question about that. I think the question is just whether there was actually a theory that would explain how he could have committed the murder. And so I looked at the warrant application, because it does mention him having video, but it doesn't tell the judge that the video actually reflects that he was where he said he was. Why doesn't the warrant application tell the judge? I mean, it says, look, he showed us this, he showed up with these SD cards, and he gave us the SD cards. Wasn't it a material omission to not tell the judge that, yeah, these SD cards do, in fact, show him driving around gambling at different places exactly like he said he was? I don't believe so at that time. If I may continue, I did mention that there was some indicia of unreliability about those particular SD cards in terms of what was originally on the video and what was cut out. So there were still questions there that did take some time to really go through and understand exactly what was on that video, what that video showed, what time the video captured. There were some inconsistencies there. I think we have your argument. Thank you, Ms. Miller. Mr. Farina-Meyer, you've reserved some time for rebuttal. Thank you, Your Honors. Briefly a couple points to respond to arguments. With regard to the Walton phone call, Ms. Walton says that it was at 930 in the transcript. There is no evidence whatsoever that Barnett was unaware of this phone call. He talks about it in his deposition. He talks about the Walton phone call in his deposition, not the timing. He talks about it in his report, and then the Walton call is in the warrant application as well. The only evidence is that he knows about it. We asked the medical examiner and the arson investigators, tell us how this could possibly work with consideration of the Walton phone call, and even after that there's no testimony from Barnett by way of declaration or otherwise that he was unaware. He may argue that down the line, but he hasn't now. Second, with regard to the issue about the dash camera unreliability, first, all trips that night are accounted for in the video. Second, any alterations to it or anything about that, that's not in the warrant. Because it's not in the warrant, we can't consider it. And the report that Barnett supposedly received indicating that there may be alterations didn't say that there were alterations from that night, and it also cannot be considered because Barnett did not get it until well after the warrant. This is a report from the U.S. Secret Service. Ms. Miller represented that no geolocation was used by Mr. Barnett. He at least told somebody to run geolocation. If we look at doc 101-2 at pages 7 and 8, he says that this investigator, Sluss, is using specialized location tools, Cellhawk and NELOS, to run location. So even if he was not subjectively aware about that, he knew how important it was because he procured a warrant for it, and then he asked someone to look at the geolocation. So what happened after the warrant compounded the tragic loss of life. Sylvester was jailed for heinous crimes he did not commit. He lost liberty, job, and humanity, and he lost his family. When Barnett told family members that the Hubbards were strangled to death and that he knew Sylvester was there at 3 a.m. for some reason, without also telling them that Sylvester never got out of the car, of course the family turned up. Then, justice for the real killer is delayed and perhaps denied because the prosecution has to present a totally new theory for how, and contradictory theory, for how these events took place. Whether there should be accountability for these harms is a question that should be entrusted to a jury, plaintiff requests reversal and remand for trial. Thank you Mr. Greenemeier and Ms. Miller, and the court is adjourned. All rise.